Joan Floyd, et al. v. Mayor and City Council of Baltimore, No. 35, September Term, 2018

**COMPREHENSIVE REZONING – TAXPAYER STANDING – SPECIAL INTEREST REQUIREMENT – NEXUS –** Court of Appeals held that trial court properly granted motion to dismiss because plaintiffs, Baltimore City taxpayers, failed to allege facts sufficient to establish taxpayer standing to maintain challenge to comprehensive rezoning and zoning map. Court held that plaintiffs failed to show special interest in subject matter of case distinct from that of general public by failing to show that allegedly illegal or *ultra vires* acts may reasonably result in pecuniary loss or increase in taxes. Court determined that plaintiffs failed to demonstrate nexus between any alleged potential pecuniary loss and challenged act, *i.e.*, connection between allegedly illegal or *ultra vires* act and harm caused to taxpayer. Court also determined plaintiffs failed to seek remedy that, if granted, would alleviate any alleged tax burden or pecuniary loss that would result if zoning map remains in place.

IN THE COURT OF APPEALS

OF MARYLAND

No. 35

September Term, 2018

_____

JOAN FLOYD, ET AL.

v.

MAYOR AND CITY COUNCIL OF
BALTIMORE

_____

Barbera, C.J.
Greene
McDonald
Watts
Hotten
Getty
Adkins, Sally D. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Watts, J.
Barbera, C.J., McDonald and Adkins, JJ.,
concur.

_____

Filed: April 1, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This case concerns taxpayer standing, and, specifically, whether certain individuals satisfied the requirements of taxpayer standing to maintain a challenge against comprehensive rezoning ordinances and a new zoning map enacted in Baltimore City. Recently, in Anne Arundel Cty. v. Bell, 442 Md. 539, 576-77, 113 A.3d 639, 661-62 (2015), we explained that taxpayer standing is a "common law standing doctrine [that] permits taxpayers to seek the aid of courts, exercising equity powers, to enjoin illegal and *ultra vires*[1] acts of public officials where those acts are reasonably likely to result in pecuniary loss to the taxpayer" or an increase in taxes. (Cleaned up). Under the taxpayer standing doctrine, among other things, a "complainant must have a special interest in the subject[ ]matter of the suit distinct from that of the general public." Id. at 576, 113 A.3d at 661 (cleaned up). The "special interest" requirement is satisfied where a complainant alleges "both 1) an action by a municipal corporation or public official that is illegal or *ultra vires*, and 2) that the action may injuriously affect the taxpayer's property, meaning that it reasonably may result in a pecuniary loss to the taxpayer or an increase in taxes." Id. at 577, 113 A.3d at 662 (cleaned up). Importantly, "there must be a 'nexus' between the showing of potential pecuniary damage and the challenged act." Id. at 579, 113 A.3d at 663 (citation omitted). Indeed, "[t]here must be [] a connection between the alleged[ly] illegal or *ultra vires* act, the harm caused to the taxpayer, and the potential for the remedy to alleviate the harm incurred." Id. at 579, 113 A.3d at 663 (citation omitted). And, "th[e]

---

[1]"*Ultra vires*" means "[u]nauthorized; beyond the scope of power allowed or granted by a corporate charter or by law[.]" *Ultra vires*, Black's Law Dictionary (10th ed. 2014).

nexus must be true not only for the complainant, but also [for] all similarly situated taxpayers." Id. at 579, 113 A.3d at 663 (citation omitted).

Here, Joan Floyd, Paul Robinson, and Deborah Tempera (together, "Petitioners"), Baltimore City taxpayers, filed in the Circuit Court for Baltimore City a complaint for declaratory judgment against the Mayor and City Council of Baltimore ("Respondent"), challenging a new comprehensive rezoning and a new zoning map, as enacted through two ordinances. Respondent filed a motion to dismiss and/or for summary judgment, alleging that Petitioners lacked the requisite taxpayer standing to maintain their case. Following a hearing, the circuit court granted the motion to dismiss, ruling that Petitioners failed to allege a specific harm unique to them or their property and that Petitioners lacked taxpayer standing. Petitioners filed a notice of appeal, and while this case was pending in the Court of Special Appeals, they filed in this Court a petition for a writ of *certiorari*. Before the Court of Special Appeals heard oral argument or issued an opinion, we granted the petition. See Floyd v. Mayor & City Council of Balt., 460 Md. 494, 190 A.3d 1037 (2018).

Against this backdrop, we decide whether the circuit court properly determined that Petitioners failed to establish the requisite taxpayer standing to proceed with this case, and, in turn, whether the circuit court erred in granting the motion to dismiss. We hold that the circuit court correctly granted the motion to dismiss because Petitioners failed to allege facts sufficient to establish taxpayer standing to maintain a challenge to the comprehensive rezoning and zoning map. We conclude that Petitioners failed to show a special interest in the subject matter of this case distinct from that of the general public by failing to sufficiently allege illegal or *ultra vires* acts by Respondent that may result in a pecuniary

- 2 -

loss or an increase in taxes. Moreover, we determine that Petitioners failed to demonstrate a nexus between any alleged potential pecuniary harm and the challenged act, *i.e.*, a connection between the allegedly illegal or *ultra vires* act and the harm caused to the taxpayer. Petitioners also failed to seek a remedy that, if granted, would alleviate any alleged tax burden or pecuniary loss. Accordingly, we affirm the circuit court's judgment.

## BACKGROUND

On October 22, 2012, City Council Bill 12-0152, also known as "TransForm Baltimore," was introduced, and assigned to the Council's Land Use and Transportation Committee ("the Committee"). Bill 12-0152 involved comprehensive rezoning in Baltimore City.[2] Over the next several years, the Committee held a public hearing on Bill 12-0152 that was recessed and reconvened numerous times. On October 20, 2016, the Committee voted on a Committee Report, in which the Committee recommended that the Council consider Bill 12-0152 favorably with amendments. On October 24, 2016, the Council held a meeting and voted favorably on Bill 12-0152 with amendments. On December 5, 2016, the Council voted to pass Bill 12-0152, the Mayor signed it, and it was enacted as Ordinance 16-581. The Mayor and the Council President also signed the accompanying Zoning Map, which was dated October 24, 2016. Ordinance 16-581 was to take effect on June 5, 2017. As of the date it was enacted, Ordinance 16-581 stated, in relevant part, that it was "ORDAINED[ t]hat the Zoning Map dated October 22, 2012[,] and accompanying this Ordinance is enacted as a part of new City Code Article 32 –

---

[2]According to Respondent, Baltimore City had not enacted a new, modernized zoning code and zoning map since 1971.

- 3 -

Zoning."

After Ordinance 16-581 was enacted, typographical errors in the Ordinance were noticed, and, on February 27, 2017, City Council Bill 17-0021 was introduced. Bill 17-0021 was entitled "Baltimore City Zoning Code – Legalization – Corrections[,]" and included the following purpose paragraph:

> FOR the purpose of legalizing new City Code Article 32 . . . as enacted by Ordinance 16-581 . . . and edited, codified, and published by the Baltimore City Department of Legislative Reference; further amending new Article 32 to correct various technical errors, omissions, and inconsistencies and to correct, clarify, and conform various references and language; providing for a special effective date; and generally relating to the zoning and development laws of the City of Baltimore.

On April 5, 2017, the Committee held a public hearing on Bill 17-0021, and voted favorably on the bill with amendments. On April 24, 2017, the Council held a meeting, and approved amendments to Bill 17-0021. One of the amendments that was adopted was the inclusion of the following language (with additions shown by capitalization, and deletions shown by brackets):

> That the Zoning Map dated [October 22, 2012] OCTOBER 24, 2016, and accompanying this Ordinance, AS THAT MAP WAS SIGNED AND APPROVED BY THE MAYOR AND CO-SIGNED BY THE PRESIDENT OF THE CITY COUNCIL, BOTH UNDER DATE OF DECEMBER 5, 2016, is enacted as part of new City Code Article 32 – Zoning.

In other words, from the amended language, it appeared that reference to the October 22, 2012 Zoning Map, as opposed to the October 24, 2016 Zoning Map, was a typographical error or inadvertent discrepancy. On May 8, 2017, the Council voted to pass Bill 17-0021. On May 16, 2017, the Mayor signed Bill 17-0021, which was enacted as Ordinance 17-015. Ordinance 17-015's effective date was the same as Ordinance 16-581's, *i.e.*, June 5,

2017.

Ten days later, on May 26, 2017, Petitioners filed in the circuit court a complaint for declaratory judgment against Respondent, challenging the comprehensive rezoning, adopted and enacted through Bill 12-0152/Ordinance 16-581 and Bill 17-0021/Ordinance 17-015, as *ultra vires* or illegal. In the complaint, Petitioners alleged that they were Baltimore City taxpayers who were bringing the "action on behalf of all Baltimore City taxpayers pursuant to the principle of taxpayer standing as set forth in" Bell, 442 Md. 539, 113 A.3d 639. And, according to Petitioners, the comprehensive rezoning would "injuriously affect the property of Baltimore City taxpayers, who [would] suffer pecuniary losses or increased taxes as a result." In the complaint, among other things, Petitioners alleged that various required notices were not mailed or published.

In the complaint, Petitioners also alleged the following in paragraphs thirty-six through fifty:

36.	The approval and enactment of the "October 22, 2012" Zoning Map as part of Bill 12-0152/Ordinance 16-581 was *ultra vires* and illegal.

37.	The "October 24, 2016" Zoning Map signed by the Mayor and City Council President on December 5, 2016 had not been adopted by the [] Council.

38.	The notice, hearing, and other due process requirements of the Land Use Article and Baltimore City Zoning Ordinance were violated, both in letter and in spirit, in the processing, approval[,] and enactment of new Baltimore City Zoning Maps as part of Bill 12-0152/Ordinance 16-581 and Bill 17-0021/Ordinance 17-015.

39.	The *ultra vires* or illegal imposition of a new Zoning Map on Baltimore City will cause Baltimore City taxpayers to suffer pecuniary losses or tax increases.

- 5 -

40.	A Zoning Map adopted by *ultra vires* or illegal means lacks the presumption of validity afforded in Maryland to lawful comprehensive rezonings.

41.	With no statute of limitations for claiming error in a comprehensive rezoning, an unlawfully adopted Zoning Map will bring prolonged instability to Baltimore City.

42.	The presumption of validity will effectively be replaced by the presumption of error, and rezoning applications based on allegations of mistake in the comprehensive rezoning will be the norm rather than the exception.

43.	A Zoning Map adopted by *ultra vires* or illegal means will be challengeable whenever a permit or zoning authorization is applied for or issued.

44.	A Zoning Map adopted by *ultra vires* or illegal means may overburden the taxpayer-funded resources of City agencies, boards[,] and commissions that review and issue permits and zoning authorizations.

45.	A Zoning Map adopted by *ultra vires* or illegal means will place extra burdens on the taxpayer-funded resources of the City Law Department, which routinely defends decisions made by City agencies, boards[,] and commissions.

46.	The efforts by private entities and [Respondent] to respond to or correct errors and allegations of mistake will be costly to Baltimore City taxpayers.

47.	Baltimore City real property will be plagued by uncertainty over regulations as to the potential construction and use of buildings and properties.

48.	A Zoning Map adopted by *ultra vires* or illegal means may cause the assessed value or market value of real property to erroneously increase or decrease.

49.	Property tax credits for the improvement of property may be erroneously granted or denied.

50.	Bonds may be issued to support the development of unlawfully rezoned property.

In the complaint, Petitioners sought declaratory judgment that Respondent had failed to mail and publish certain notices; that Bill 17-0021/Ordinance 17-015 was "null and void as to its adoption and enactment of a Baltimore City Zoning Map"; that the adoption and enactment of the "Zoning Maps was *ultra vires* or illegal, and [thus] null and void"; and that the Zoning Maps were "of no effect."

On May 26, 2017, the same day that the complaint was filed, Petitioners filed a motion for summary judgment and accompanying memorandum in support,[3] in which they argued:

> The procedures by which [Respondent] adopted and enacted new Baltimore City Zoning Maps, first in December of 2016 and later in May of 2017, are not found in the Land Use Article and Baltimore City Zoning Ordinance. There were multiple[] egregious failures: failure to provide Baltimore City property owners with notice of changes proposed to the zoning or their properties; failure to conduct all required hearings; failure to provide required hearing notice, both mailed and advertised; and[,] in the case of the most recent action, failure to hold Bill 17-0021 over for one regular City Council meeting before giving final approval to the new Zoning Map. That Zoning Map, scheduled to become effective on June 5, 2017, was adopted and enacted by *ultra vires* and illegal means and must not become the new Baltimore City Zoning Map.

A few days later, on May 31, 2017, Petitioners filed a motion for a temporary restraining order, seeking to block the Zoning Map from going into effect on June 5, 2017. On June 2, 2017, Respondent filed an opposition to the motion. On the same date, the circuit court conducted a hearing on the motion for a temporary restraining order. During

---

[3]Petitioners also filed a motion for interlocutory injunctive relief. Respondent filed an opposition to the motion. Because the circuit court later granted Respondent's motion to dismiss, it did not rule on the motion for interlocutory injunctive relief.

the hearing, Petitioners' counsel argued that Petitioners were bringing this case "as a taxpayer suit, . . . [b]ased on the fact that the taxpayers of the City of Baltimore will be taxed to the limit for challenges that will occur" to the Zoning Map. Petitioners' counsel contended that "irreparable harm" would occur to all Baltimore City taxpayers, in "that permits will be issued under the new illegal zoning map . . . [t]hat will then cause challenges[.]" When asked to clarify what the irreparable harm would be, Petitioners' counsel asserted: "Irreparable harm is the City will be forced to defend [] multiple violations of issuing a permit based on an illegal map." Petitioners' counsel contended that the harm to Baltimore City taxpayers would be "higher [cost]s, more money spent[,]" and that, "[b]ecause it's a taxpayer's suit in which monies will be expended by the City[,] that will ultimately be bo[]rne by the taxpayer."

The circuit court heard argument from Respondent's counsel and brief rebuttal argument from Petitioners' counsel. At the conclusion of the hearing, ruling orally from the bench, the circuit court denied the motion for a temporary restraining order. On the same day, the circuit court issued an order denying the motion for a temporary restraining order, stating, in relevant part:

> [Petitioner]s have not shown by any "specific facts" in their motion, affidavit, and memorandum that any harm will result. They assert that taxpayers "may" suffer a pecuniary loss. This is insufficient for a motion for such extraordinary relief. The list of potential burdens and uncertainty does not bolster [Petitioner]s' position. Without a defined harm, [Petitioner]s cannot show a likelihood of success on the merits.

> On June 5, 2017, the new Zoning Code and Map became effective.

> On June 29, 2017, Respondent filed a motion to dismiss and/or for summary

judgment and opposition to Petitioners' motion for summary judgment, and an accompanying memorandum of law. Respondent argued that Petitioners failed to establish taxpayer standing for three reasons: (1) Petitioners failed to "allege a special interest in the subject[ ]matter of the suit distinct from that of the general public"; (2) the allegedly illegal and *ultra vires* acts had "no reasonable relationship to the likelihood of a potential tax increase"; and (3) Petitioners failed to establish a nexus between the potential pecuniary damage and the challenged act. (Cleaned up). As to the failure to allege a special interest, Respondent asserted that Petitioners alleged a harm that was applicable to the general public, and was not specific to them. Respondent maintained that taxes in Baltimore City were not being raised as a result of the comprehensive rezoning, and zoning classifications in the ordinances and accompanying Zoning Map had no relationship to taxes, as a "property taxpayer's tax rate is not based or premised upon his or her zoning classification[.]" And, as to the nexus requirement, Respondent contended that Petitioners were not seeking a remedy that, if granted, would alleviate an impact on taxes as alleged.

On July 19, 2017, Petitioners filed an opposition to the motion to dismiss and/or for summary judgment. In pertinent part, Petitioners contended that they had taxpayer standing, and that the relief they requested—voiding of the Zoning Maps—was an available remedy. Petitioners argued that they had established taxpayer standing under Bell, 442 Md. 539, 113 A.3d 639, and that "[a]dministration of an unlawfully updated Zoning Map [would] be costly to the taxpayers." Petitioners asserted that, in the complaint, they had alleged "numerous negative impacts on the taxpayers if" the "unlawfully adopted Zoning Map" were utilized, and that the allegations of the complaint demonstrated the

necessary "nexus between the taxpayers and an unlawfully adopted Zoning Map[.]" (Cleaned up).

On August 7, 2017, the circuit court conducted a hearing on the motion to dismiss. During the hearing, Petitioners' counsel contended that Petitioners had taxpayer standing, and argued that the allegations of the complaint demonstrated the effects on taxpayers. And, Petitioners' counsel reiterated that, if the Zoning Map and ordinances stood as is, there would "be substantial litigation against the City or about the City's action, and that is where the taxpayers will end up paying more taxes to support . . . an expanding law department[.]" At the conclusion of the hearing, the circuit court held the matter *sub curia*.

One week later, on August 14, 2017, the circuit court issued an order granting the motion to dismiss, stating, in relevant part:

> **FOUND** that [Petitioner]s' suit is a challenge to a purely legislative action of the [] Council, and it is further
>
> **FOUND** that [Petitioner]s do not allege a specific harm [that] is unique to them or their property as described in [] ***Bell***, 442 Md. 539[, 113 A.3d 639], and it is further
>
> **ORDERED** that the Motion to Dismiss is **GRANTED**, as [Petitioner]s lack standing to maintain this taxpayer's challenge[.]

(Bolding and capitalization in original).

Petitioners filed a notice of appeal. On June 15, 2018, while this case was pending in the Court of Special Appeals, Petitioners filed in this Court a petition for a writ of *certiorari*, raising the following issue:

> Did Petitioners sufficiently plead taxpayer standing to allow their challenge to the enactment of new comprehensive zoning maps to be adjudicated, and did the [c]ircuit [c]ourt err when it granted the Motion to Dismiss for lack of

taxpayer standing?

On August 30, 2018, before the Court of Special Appeals heard oral argument or issued an opinion, this Court granted the petition. See Floyd, 460 Md. 494, 190 A.3d 1037.

## DISCUSSION

### The Parties' Contentions

Petitioners contend that they sufficiently pled taxpayer standing to permit a challenge to the enactment of the new Zoning Maps to go forward on the merits, and that, as such, the circuit court erred in granting the motion to dismiss on the ground of lack of taxpayer standing. Petitioners argue that the circuit court's grant of the motion to dismiss essentially constituted a determination that there could never be taxpayer standing sufficient to challenge comprehensive rezoning in Baltimore City. Petitioners assert that, in the complaint, they alleged numerous potential effects that unlawful comprehensive rezoning could have on Baltimore City taxpayers. Petitioners maintain that, in the complaint, as to potential harm, they alleged, among other things, that "[t]he ultra vires or illegal imposition of a new Zoning Map . . . will cause Baltimore City taxpayers to suffer pecuniary losses or tax increases[,]" and that "[t]he efforts by private entities and [Respondent] to respond to or correct errors and allegations of mistake will be costly to Baltimore City taxpayers."

Respondent counters that the circuit court properly granted the motion to dismiss on the ground that Petitioners had failed to establish taxpayer standing. Respondent contends that Petitioners failed to adequately demonstrate a special interest distinct from that of the general public, and that the alleged harm, *i.e.*, the allegedly illegal or *ultra vires* act, has no

- 11 -

reasonable relationship to taxes in Baltimore City. Respondent argues that taxpayer standing is usually satisfied in cases where taxpayers challenge a government action in the form of "a large[-]scale public expenditure, capital investment, or transaction for which the government could reasonably be expected to raise taxes to effectuate." Respondent asserts that, by contrast, in this case, the bills at issue were not spending or tax bills, taxes are not being raised as a result of the enactment of the ordinances, and zoning classifications and the Zoning Map have no relationship to taxes. Respondent maintains that Petitioners did not clearly show potential pecuniary loss or a reasonable relationship to government expenditure or taxation. Respondent contends that Petitioners failed to show the required nexus for taxpayer standing and argues that there is no meaningful connection between the specific allegedly illegal or *ultra vires* acts and the harms claimed.

Respondent argues that Petitioners fail to seek a remedy that, if granted, would alleviate the tax burden they allege will result if the Zoning Map is allowed to remain in place. Respondent asserts that Petitioners, in actuality, allege that Baltimore City will be forced to expend funds to correct errors allegedly made under the Zoning Map and to enact new legislation to replace the Zoning Map. Respondent maintains that the remedy sought—nullification of the new Zoning Map, but not of the new Zoning Code—would create chaos because Baltimore City would be governed by a Zoning Code that is designed for a Zoning Map that would no longer be valid, and the remedy does not alleviate any alleged pecuniary loss or increase in taxes.

As a final matter, Respondent contends that concluding that taxpayer standing exists in this case would run counter to public policy as recognized in Bell, 442 Md. 539, 113

- 12 -

A.3d 639, in which this Court eliminated property owner standing as a basis to maintain a challenge to comprehensive rezoning. According to Respondent, permitting Petitioners to proceed under their "theory of taxpayer standing would be no different than allowing property owner standing to exist in the comprehensive rezoning context because every taxpayer, like every property owner, could bring such a challenge." (Emphasis omitted).

In a reply brief, Petitioners contend that applying taxpayer standing to a comprehensive rezoning challenge as in this case does not conflict with or undermine the doctrine of taxpayer standing.

## Standard of Review

In State Ctr., LLC v. Lexington Charles Ltd. P'ship, 438 Md. 451, 496-97, 92 A.3d 400, 426-27 (2014), this Court explained that we review without deference a trial court's grant of a motion to dismiss, stating:

> Considering a motion to dismiss a complaint for failure to state a claim upon which relief may be granted, a court must assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them, and order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.*, the allegations do not state a cause of action for which relief may be granted. Consideration of the universe of "facts" pertinent to the court's analysis of the motion are limited generally to the four corners of the complaint and its incorporated supporting exhibits, if any. The well-pleaded facts setting forth the cause of action must be pleaded with sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice. Upon appellate review, the trial court's decision to grant such a motion is analyzed to determine whether the court was legally correct.

(Citation omitted). Similarly, where, in considering a motion to dismiss, a trial court considers materials, such as affidavits, outside of the complaint (*i.e.*, the complaint and

- 13 -

documents attached thereto), we treat the trial court's grant of a motion to dismiss as a grant of summary judgment, and we review the matter without deference for legal correctness.  See Bell, 442 Md. at 552, 113 A.3d at 647.

## Taxpayer Standing

In Maryland, "[c]hallengers to comprehensive zoning ordinances . . . are required to satisfy the requirements of taxpayer standing, rather than property owner standing[,]" to maintain their actions.  Bell, 442 Md. at 575, 113 A.3d at 661.[4]  As we have stated: "[P]laintiffs wishing to challenge in Maryland courts the legislative process and final action adopting a comprehensive zoning are required to demonstrate taxpayer standing—the standing doctrine applicable to judicial challenges to legislative actions."  Anne Arundel Cty. v. Harwood Civic Ass'n, Inc., 442 Md. 595, 598, 113 A.3d 672, 674 (2015) (citation omitted).  Taxpayer standing is a "common law standing doctrine [that] permits taxpayers to seek the aid of courts, exercising equity powers, to enjoin illegal and *ultra vires* acts of public officials where those acts are reasonably likely to result in pecuniary loss to the taxpayer."  Bell, 442 Md. at 576, 113 A.3d at 661 (cleaned up).  Under the doctrine of taxpayer standing, "[t]he taxpayer does not assert a private cause of action but, instead, that

---

[4]In Bell, 442 Md. at 558, 113 A.3d at 650, we explained that property owner standing generally exists where "an adjoining, confronting[,] or nearby property owner is deemed, *prima facie*, to be specially damaged and, therefore, a person aggrieved[,]" or where "a person whose property is far removed from the subject property . . . meets the burden of alleging and proving that his [or her] personal or property rights are specially and adversely affected."  (Cleaned up).  And, in Bell, id. at 574-75, 113 A.3d at 660, we concluded that "[e]xtending the doctrine of property owner standing to challenges to the legislative process of adopting comprehensive zoning ordinances [would be] inconsistent with our prior cases[.]"

- 14 -

of his [or her] government.   Therefore, a taxpayers' suit is essentially a derivative proceeding akin to a corporate shareholders' suit." State Ctr., 438 Md. at 541, 92 A.3d at 543 (cleaned up).  The doctrine of taxpayer standing "exists to ensure that government acts within the bounds of the law[,]" and to "protect [] citizen[s] from the consequence of [] unauthorized or illegal acts."  Bell, 442 Md. at 576, 113 A.3d at 661 (cleaned up). Importantly, however, the doctrine of taxpayer standing does not "provide unfettered access to the courts to citizens unhappy with all actions taken by [S]tate or local governing bodies[.]"  Id. at 576, 113 A.3d at 661.

As an initial matter, a complainant must demonstrate that he, she, or it is eligible under the taxpayer standing doctrine; specifically, "[t]o establish eligibility to maintain a suit under the taxpayer standing doctrine, a complainant must allege two things: (1) that the complainant is a taxpayer[;] and (2) that the suit is brought, either expressly or implicitly, on behalf of all other taxpayers."  Id. at 577, 113 A.3d at 662 (cleaned up).[5] After a complainant establishes eligibility to bring a suit, the complainant must, among other things, show "a special interest in the subject[ ]matter of the suit distinct from that of the general public."  Bell, 442 Md. at 578, 576, 113 A.3d at 662, 661 (cleaned up).  The "special interest" requirement is satisfied where a complainant alleges "both 1) an action

---

[5]In State Ctr., 438 Md. at 547, 92 A.3d at 457, we explained that, "[f]or purposes of [the] taxpayer standing doctrine, the conceptual basis of the doctrine is that the action is brought by complainants, as taxpayers and on behalf of all other similarly situated taxpayers." (Emphasis omitted).  Stated otherwise, under the doctrine of taxpayer standing, "a complainant's standing rests upon the theoretical concept that the action is brought not as an individual action, but rather as a class action by a taxpayer on behalf of other similarly situated taxpayers." Id. at 547, 92 A.3d at 457.

by a municipal corporation or public official that is illegal or *ultra vires*, and 2) that the action may injuriously affect the taxpayer's property, meaning that it reasonably may result in a pecuniary loss to the taxpayer or an increase in taxes." Id. at 577, 113 A.3d at 662 (cleaned up).

As to the first requirement—that the government's action is "illegal or *ultra vires*"—we have observed that the requirement is "applied leniently and seems rather easy to meet[ as] the taxpayer need not be right ultimately in his, her, or its contention, so long as the allegation is advanced in good faith." Id. at 578, 113 A.3d at 662 (cleaned up). The second requirement—that the taxpayer has suffered a "specific injury"—"has been interpreted repeatedly to require a showing that the action being challenged results in a pecuniary loss or an increase in taxes." Id. at 578, 113 A.3d at 662 (cleaned up). "The harm alleged must be particularized and pecuniary, as opposed to harms to the general public (e.g., changes to the neighborhood, increased traffic, or increased noise), and caused potentially by the comprehensive rezoning." Cty. Council of Prince George's Cty. v. Zimmer Dev. Co., 444 Md. 490, 509 n.10, 120 A.3d 677, 688 n.10 (2015) (citing Bell, 442 Md. at 578-79, 585, 113 A.3d at 662-63, 667). That said, "[t]he facts alleged need not lead necessarily to the conclusion that taxes will increase; rather, the taxpayer must allege that he, she, or it will suffer pecuniary damage potentially." Bell, 442 Md. at 578, 113 A.3d at 663 (citation omitted).

Significantly, "there must be a 'nexus' between the showing of potential pecuniary damage and the challenged act." Id. at 579, 113 A.3d at 663 (citation omitted). The "nexus" requirement has been "perhaps the most frequent stumbling block for

- 16 -

complainants claiming taxpayer standing." Id. at 579, 113 A.3d at 663 (cleaned up). Indeed, to demonstrate a nexus, "the taxpayer must be asserting a challenge and seeking a remedy that, if granted, would alleviate the tax burden on that individual and others; otherwise, standing does not exist." Id. at 579, 113 A.3d at 663 (citation omitted). "There must be[,] therefore[,] a connection between the alleged[ly] illegal or *ultra vires* act, the harm caused to the taxpayer, and the potential for the remedy to alleviate the harm incurred." Id. at 579, 113 A.3d at 663 (citation omitted). And, "th[e] nexus must be true not only for the complainant, but also [for] all similarly situated taxpayers." Id. at 579, 113 A.3d at 663 (citation omitted).

In Bell, id. at 579-80, 113 A.3d at 663-64, we observed that "taxpayer standing has been pled successfully in a number of cases pertaining to executive, administrative, or quasi-land use actions[,]" and "in cases challenging legislation generally." (Citations omitted). We noted that "[c]hallenges to comprehensive rezoning ordinances are brought often by parties whose properties were rezoned, usually to categories less desirable by the owner or contract purchaser than enjoyed previously." Id. at 580, 113 A.3d at 664 (citations omitted).

In Boitnott v. Mayor and City Council of Balt., 356 Md. 226, 228, 234, 738 A.2d 881, 882 (1999), a case involving a challenge to the validity of a Baltimore City ordinance amending an urban renewal plan, this Court observed that the plaintiffs had successfully alleged taxpayer standing. In that case, several taxpayers filed a complaint for declaratory relief and a motion for an interlocutory injunction against Respondent, seeking to invalidate the ordinance. See id. at 232, 738 A.2d at 884. The trial court determined that the

- 17 -

ordinance was valid, and the Court of Special Appeals affirmed. See id. at 233-34, 738 A.2d at 885. The plaintiffs petitioned for a writ of *certiorari*, arguing that the ordinance was invalid for several reasons, including that property could not be changed from private to public ownership after the adoption of an urban renewal plan, and that a zoning ordinance could not be incorporated by reference into an urban renewal plan. See id. at 234-35, 738 A.2d at 885-86. In this Court, before addressing the merits of the case, we briefly addressed the standing of the plaintiffs, and observed that the plaintiffs had sufficiently alleged taxpayer standing in the complaint. See id. at 234, 738 A.2d at 885. Although standing was not at issue before this Court because the trial court had not dismissed Boitnott for lack of standing, see id. at 233 n.7, 738 A.2d at 885 n.7, we stated: "The allegation by the [plaintiff]s that the City has expended [t]wenty million dollars in developing Inner Harbor East prior to the present litigation is [a] sufficient allegation of potential pecuniary damage by way of [a] tax increase to withstand a standing challenge." Id. at 234, 738 A.2d at 885.

In Inlet Assocs. v. Assateague House Condo. Ass'n, 313 Md. 413, 417, 441, 545 A.2d 1296, 1298, 1310 (1988)—"a taxpayers' action to enjoin, and conversely a real estate developer's suit to compel, the conveyance of a municipality's public right-of-way in part of a dedicated street, together with riparian rights[6] purported to accrue as a result of the municipality's interest in the dedicated street"—this Court agreed with the trial court that

---

[6]A "riparian right" is "[t]he right of a landowner whose property borders on a body of water or watercourse. [] Such a landowner traditionally has the right to make reasonable use of the water." Riparian right, Black's Law Dictionary (10th ed. 2014).

the plaintiffs had taxpayer standing. In that case, various taxpayers and property owners sued Ocean City, its Mayor, and the City Council President, alleging that public property was being given to private persons without adequate consideration. See Inlet Assocs., 313 Md. at 422, 545 A.2d at 1300. The real estate developer intervened as a defendant and contended that the plaintiffs lacked standing. See id. at 423, 545 A.2d at 1301. In relevant part, among other things, the trial court determined that the plaintiffs had standing. See id. at 424, 545 A.2d at 1301. The trial court "found that [the plaintiffs] were taxpayers and property owners in Ocean City, all but one of whom lived in close proximity to the project proposed by" the developer. Id. at 440, 545 A.2d at 1310. The trial court determined that the plaintiffs had sufficiently alleged that they suffered "a special pecuniary injury" that "flowed from the ultra vires action of the municipality, *i.e.*, that the value of their properties may be adversely impacted by the [] proposal and that they had also suffered damage, having shown that their taxes might be increased as a result of the project." Id. at 440, 545 A.2d at 1310.

In this Court, the developer contended that the plaintiffs lacked standing because they failed to establish "that the proposed conveyances of municipal property caused them any special damage distinct in character from any injury sustained by members of the general public." Id. at 440, 545 A.2d at 1310. And, the developer argued that the plaintiffs had failed to "show that the challenged action would increase their taxes or otherwise cause them any pecuniary loss." Id. at 440, 545 A.2d at 1310. We observed that a "taxpayer plaintiff is not required to allege facts [that] necessarily lead to the conclusion that taxes will be increased; rather, the test is whether the taxpayer reasonably may sustain a

pecuniary loss or a tax increase—whether there has been a showing of potential pecuniary damage." Id. at 441, 545 A.2d at 1310 (cleaned up). We "agree[d] with the trial [court] that the plaintiffs had standing[,]" explaining:

> It was alleged[,] and sufficient proof [was] adduced[,] that the [] unit owners looked directly upon [the developer]'s proposed project, including [a] restaurant. There was some evidence that the municipality's property interests were valued in excess of one million dollars[,] and[,] if it received fair value for it[, Ocean] City might reduce taxes or forego a tax increase in the future; and that there would be a loss of substantial revenue from the metered parking spaces on that part of [the s]treet[,] which was to be closed[,] and that this would have an adverse impact on [the] plaintiffs' taxes. There was also evidence that guests and invitees of the property owners now use that part of [the s]treet to be conveyed to [the developer] for parking[,] and that this usage enhances the value of their respective properties. It was also alleged and shown that[,] as a 75-foot wide street, [the s]treet was of extreme value in itself; that, in particular, it provided public access to the [Sinepuxent B]ay, the loss of which would adversely affect the value and use of the plaintiffs' properties; that the restaurant in particular would obstruct the view of the bay and lessen the value of the plaintiffs' properties. In these ways, the plaintiffs claimed that they would be specially harmed in a manner distinct from the general public[,] in that their properties would [] decrease[] in value, as found by the trial [court]. And, finally, the plaintiffs alleged that[,] as taxpayers[,] they would sustain a loss from the expenditure of City funds [that] would be necessary for the City to defend the legality of the proposed conveyances.

Id. at 441-42, 545 A.2d at 1310-11. We rejected the developer's contention that the plaintiffs' taxes would likely decrease, rather than increase, if the project were to proceed, stating that, "in determining a taxpayer's pecuniary interest resulting from a[n allegedly] unlawful governmental act, the court will not weigh potential gains against potential losses and speculate on a net result." Id. at 442, 545 A.2d at 1311 (citation omitted). We concluded that, based on the record, we could not say that the trial court had "erred in finding [] standing[.]" Id. at 443, 545 A.2d at 1311.

In <u>State Ctr.</u>, 438 Md. at 583, 92 A.3d at 479, this Court concluded that the plaintiffs had taxpayer standing. <u>State Ctr.</u> concerned "a $1.5 billion, multi-phase redevelopment projected intended to replace aged and obsolete State office buildings with new facilities for State use and to revitalize an approximately 25-acre property owned by the State of Maryland in midtown Baltimore [], without burdening unduly the State's capital budget." <u>Id.</u> at 473, 92 A.3d at 413. To that end, the State solicited and selected a master developer, and the master developer and State agencies executed various agreements concerning the project. <u>See</u> <u>id.</u> at 473-74, 92 A.3d at 413. Fifteen plaintiffs, all of whom were taxpayers of the State and owners of property in downtown Baltimore—"many with available office space for rent"—filed suit seeking an injunction to halt the project, and a declaratory judgment that the formative contracts for the project were void. <u>See</u> <u>id.</u> at 474, 92 A.3d at 413. We considered whether the plaintiffs had either property owner standing or taxpayer standing. <u>See</u> <u>id.</u> at 474, 92 A.3d at 413.[7]

As to taxpayer standing, we stated, in relevant part, that the plaintiffs' allegation that the State had violated applicable procurement laws by entering into formative contracts for the project through means other than a public competitive bidding process was "alone [] sufficient (for pleading purposes) to meet th[e] element of the requisite injury component of the taxpayer standing doctrine as to [the plaintiff]s for those challenges." <u>State Ctr.</u>, 438 Md. at 570, 92 A.3d at 471. We also concluded that there was a nexus between the plaintiffs' allegations of taxpayer harm and the allegedly illegal acts of public officials.

----

[7]This Court concluded that the plaintiffs did not have property owner standing. <u>See</u> <u>State Ctr.</u>, 438 Md. at 538, 92 A.3d at 451.

See id. at 577, 92 A.3d at 475. We noted that the plaintiffs had alleged that: the project was expected to cost $1.5 billion; a State agency had assumed the obligation to design, finance, construct, operate, and maintain an underground garage for the project, and agreed to contribute up to $28 million in taxpayer funds toward the cost of the garage design and construction; and issuance of $33 million in bonds supported by taxpayer revenues to build the parking garage had been approved. See id. at 577, 92 A.3d at 475. Moreover, the plaintiffs had alleged that they would "uniquely bear the excessive costs" and increased taxes as a result of the State's failure to use a competitive bidding process. Id. at 579, 92 A.2d at 476-77. We determined that these "allegations [were] sufficient" to establish a nexus. Id. at 580, 92 A.3d at 477. Finally, we stated that, although a plaintiff must make "a clear showing that a monetary burden is alleged[,]" a taxpayer is "not required to prove an exact amount of pecuniary damage that he[,] she[, or it] will suffer." Id. at 580, 92 A.3d at 477. As such, we determined that the plaintiffs had "pleaded sufficiently a loss of revenue from the public funds as contributed by them as taxpayers." Id. at 581, 92 A.3d at 478. This Court ultimately "conclude[d] that [the plaintiff]s pleaded [the] taxpayer standing doctrine sufficiently[.]" Id. at 583, 92 A.3d at 479.

In Citizens Planning and Housing Ass'n v. Cty. Exec. of Balt. Cty., 273 Md. 333, 345, 329 A.2d 681, 687 (1974), this Court determined that plaintiffs had taxpayer standing. In that case, the plaintiffs—"a metropolitan-area civic organization, a group of neighborhood and area civic improvement associations, and several individuals alleging [that] they [were] residents, citizens, taxpayers[,] and property owners of Baltimore County"—alleged that the Baltimore County Executive and Baltimore County

Administrative Officer "initiated a reorganization of the Office of Planning and Zoning in violation of . . . the Baltimore County Charter, which confer[red]" such responsibility upon the Baltimore County Council. Id. at 334-35, 329 A.2d at 682. The plaintiffs alleged "special damages" in two ways: (1) the actions of the defendants would make the Office less efficient, resulting in an impairment of the property tax base, "therefore causing a prospective pecuniary loss incident to the increase in the amount of taxes the [p]laintiffs and other [] taxpayers [would] be constrained to pay"; and (2) "a charter[-]created mechanism to assure proper planning and zoning practices and processes within [Baltimore] County had been made less efficient and more costly[,] and [the plaintiffs'] property [stood] to depreciate in value[.]" Id. at 335-36, 329 A.2d at 682-83. In other words, the plaintiffs anticipated pecuniary loss and higher taxes as a result of the allegedly *ultra vires* and illegal actions of the defendants. See id. at 337, 329 A.2d at 683. We observed that "[t]here [was] considerable force in the argument . . . that[,] if the reorganization [was] unlawful, the expenditure of public funds to finance that program may thereby be open to question." Id. at 343, 329 A.2d at 686. We further stated that "the waste of tax-derived monies that will have resulted from funding positions declared to be illegally created [w]as sufficient to confer standing." Id. at 343, 329 A.2d at 686. Moreover, we noted that it was "not illogical to expect that the county might incur some expense or loss, to the detriment of the taxpayers, including [plaintiff]s, in an effort to fend off the charges of illegality. Such potential losses alone may be sufficient to establish standing." Id. at 343, 329 A.2d at 687 (citation omitted).

Similarly, in other cases, this Court has concluded that taxpayer standing existed

where a local government had expended public funds or levied taxes. For example, in James v. Anderson, 281 Md. 137, 139-40, 142, 377 A.2d 865, 866-67, 868 (1977), where an individual challenged a county executive's expenditure of $5 million in bond proceeds for the construction of a new courthouse, this Court concluded that taxpayer standing existed, explaining: "The plaintiff challenges, as ultra vires, the actions of a County Executive, and points to a claimed decrease in efficiency [that] would result from the alleged ultra vires acts. . . . [T]his is sufficient for a taxpayer of the county involved to maintain a suit." (Cleaned up). And, in McKaig v. Mayor and City Council of Cumberland, 208 Md. 95, 103, 116 A.2d 384, 388 (1955), this Court concluded that the plaintiff had sufficiently alleged that he would be "pecuniarily affected[,]" and thus, had standing. In that case, the plaintiff challenged "an agreement between the City [of Cumberland] and the State Roads Commission for the construction of a crosstown expressway or viaduct and other highways in the [c]ity[.]" Id. at 99, 116 A.2d at 386. In concluding that there was standing, we noted that the plaintiff had alleged that "$70,000 a year [was] to be diverted for seven years from moneys [that] would otherwise be available to the [c]ity for highway maintenance and like purposes and [was] to be used to help [] pay the cost of construction of the expressway[,]" and the circumstance that the city's budget "provide[d] more than $127,000 for streets and alleys [made clear] that these funds will have to be replaced by moneys derived through increased taxes, of which the [plaintiff would] have to pay his share." Id. at 102, 116 A.2d at 388.

By contrast, in Bell, 442 Md. at 546, 583, 113 A.3d at 643, 665, where the plaintiffs challenged the County Council for Anne Arundel County's "adoption of a comprehensive

- 24 -

zoning ordinance for a large portion of Anne Arundel County[,]" this Court held that the plaintiffs lacked taxpayer standing. We observed that, in the complaint, the plaintiffs had alleged that "the actions taken by [Anne Arundel] County in adopting the [ordinance] constituted 'illegal spot zoning.'" Id. at 583-84, 113 A.3d at 666. Nevertheless, the plaintiffs were also required to show "that the [allegedly] illegal action [would] result in a pecuniary loss or an increase in taxes." Id. at 584, 113 A.3d at 666. As to that requirement, we observed that, in the complaint, the plaintiffs had alleged an increase in traffic, the destruction of a forest buffer, and increased noise, and had alleged that their "right to participat[e] in zoning changes and in the enforcement of the orderly planning procedures specified in the County Code ha[d] been harmed." Id. at 584, 113 A.3d at 666 (footnote omitted). Significantly, however, the plaintiffs had "not allege[d] that their taxes would be increased[,] or that the [allegedly] illegal action would result in any other form of pecuniary loss." Id. at 584, 113 A.3d at 666 (footnote omitted). As such, we concluded that the plaintiffs "did not satisfy the requirements of taxpayer standing[,]" explaining:

> Frustration with increased traffic, annoyance with increased noise, and violations of a right (if any) to participate in zoning changes are not the sort of harms with which taxpayer standing is concerned. Even if these harms were within the purview of taxpayer standing, they are not unique to the [plaintiff]s, as opposed to the general public.

Id. at 585, 113 A.2d at 667 (footnote omitted).

And, in Citizens Comm. of Anne Arundel Cty., Inc. v. Cty. Comm'rs of Anne Arundel Cty., 233 Md. 398, 399-400, 197 A.2d 108, 108-09 (1964), where "an incorporated citizens committee and a group of individual county residents, citizens[,] and taxpayers" challenged the constitutionality and validity of local laws authorizing the operation of

gambling devices and activities, this Court held that the plaintiffs had failed to establish taxpayer standing. This Court observed that it was undisputed that the incorporated citizens committee lacked standing to sue. See id. at 400, 197 A.2d at 109. We stated that, although the individual plaintiffs had alleged that "carrying out the provisions of the alleged[ly] unconstitutional and invalid laws . . . ha[d] resulted in loss and damage to them and all other taxpayers in the county, they have failed to prove or show any special damage or loss [] peculiar to themselves as taxpayers or otherwise." Id. at 400, 197 A.2d at 109.

We rejected the plaintiffs' arguments that they suffered, or would potentially suffer, pecuniary loss and damage in two ways. See id. at 404, 197 A.2d at 111-12. First, the plaintiffs had argued pecuniary loss due to "the cost of administering [an] amusement licensing program" that came from general funds. Id. at 404, 197 A.2d at 111. We noted that this fact was undisputed, but we observed that "it was also shown that this situation was not restricted to the [plaintiff]s[,] and that the revenue from the licensing program exceeded the cost of administration by more than $500,000." Id. at 404, 197 A.2d at 111. Thus, we concluded that it appeared "obvious" that the plaintiffs had "suffered no pecuniary loss due to the fact that some of the administration expenses were paid out of general public funds." Id. at 404, 197 A.2d at 111.

As to the plaintiffs' second argument, we explained:

Their second argument[—]to the effect that[,] should the statutes and ordinances be declared void in a fiscal year prior to the time that the bulk of the revenue is received from the licensing program, the taxpayers would be burdened to meet all expenditures and obligations incurred thereunder[—]seems to be an effort to attain standing by raising themselves to that position by their own 'bootstraps' in that they seek to show damage to themselves, not by what has occurred or is likely to occur, of which there is no proof, but

- 26 -

by what might occur should they be successful in having the statutes and ordinances declared unconstitutional or invalid. Even if there were evidence that the county had expended general public funds in anticipation of revenues from the amusement licensing program, it is evident that the taxpayers would be damaged by a discontinuance of the program rather than a continuance of it. In any event[,] it is clear that the loss or damage the [plaintiff]s claim to have sustained has likewise been proportionately suffered by all other taxpayers in the county.

Id. at 404, 197 A.2d at 111-12. And, we determined that the plaintiffs had failed to prove that they had a sufficient interest to test the constitutionality or validity of the statutes at issue. See id. at 405, 197 A.2d at 112. See also State Ctr., 438 Md. at 573, 92 A.3d at 472-73 (We described the holding in Citizens Committee, 233 Md. at 405, 197 A.2d at 112, as follows: "[T]he Court held that the taxpayer[s] did not prove or show that [they] had a sufficient interest to test the constitutionality or validity of the pertinent statute[s] because the remedy sought, if granted, would not decrease the taxpayer's burden.").

**Analysis**

Here, we hold that Petitioners failed to allege facts sufficient to establish taxpayer standing to maintain a challenge to the comprehensive rezoning ordinances and the Zoning Map. We conclude that Petitioners failed to show a special interest in the subject matter of this case distinct from that of the general public by failing to show that the allegedly illegal or *ultra vires* acts by Respondent may reasonably result in a pecuniary loss or an increase in taxes. Moreover, we determine that Petitioners failed to demonstrate a nexus between any alleged potential pecuniary harm and the challenged act, *i.e.*, a connection between the allegedly illegal or *ultra vires* act and the harm caused to the taxpayer. Petitioners also failed to seek a remedy that, if granted, would alleviate any alleged tax

- 27 -

burden or pecuniary loss that would result if the Zoning Map remains in place. As such, we hold that the circuit court was correct in granting the motion to dismiss.

To maintain a challenge to the comprehensive rezoning ordinances at issue, Petitioners must satisfy the requirements of taxpayer standing. See Bell, 442 Md. at 575, 113 A.3d at 661. As an initial matter, Petitioners have sufficiently demonstrated eligibility to maintain the action under the taxpayer standing doctrine by alleging in the complaint that they are Baltimore City taxpayers and that the suit was brought on behalf of all other Baltimore City taxpayers. See id. at 577, 113 A.3d at 662 ("To establish eligibility to maintain a suit under the taxpayer standing doctrine, a complainant must allege two things: (1) that the complainant is a taxpayer[;] and (2) that the suit is brought, either expressly or implicitly, on behalf of all other taxpayers." (Cleaned up)). Indeed, in the complaint, Petitioners specifically alleged that each of them is a "Baltimore City taxpayer" and that they were bringing the "action on behalf of all Baltimore City taxpayers pursuant to the principle of taxpayer standing as set forth in" Bell.

Establishing eligibility to maintain a suit under the taxpayer standing doctrine, however, is but the first part of satisfying the requirements of taxpayer standing. Petitioners must also show "a special interest in the subject[ ]matter of the suit distinct from that of the general public." Id. at 576, 113 A.3d at 661 (cleaned up). Based on the allegations in this case, Petitioners fail to satisfy the special interest requirement. With respect to the first part of the special interest requirement—i.e., the illegal or *ultra vires* requirement—a plaintiff must allege an action by a municipal corporation or public official that is illegal or *ultra vires*, and we apply the requirement "leniently" and do not require

that a plaintiff be ultimately correct in his or her contention, "so long as the allegation is advanced in good faith." Id. at 578, 113 A.3d at 662 (citation omitted). To be sure, in this case, in light of the leniency with which the illegal or *ultra vires* requirement is to be applied, we have no difficulty in concluding that Petitioners sufficiently alleged illegal or *ultra vires* acts by Respondent. Indeed, in the complaint, Petitioners alleged numerous illegal or *ultra vires* acts by Respondent related to the adoption and enactment of the ordinances and Zoning Map. For example, Petitioners alleged that Respondent violated applicable notice, hearing, and other due process requirements. Thus, viewed leniently, the allegations of the complaint satisfy the requirement that a plaintiff allege governmental action that is illegal or *ultra vires*.

Petitioners do not fare so well with respect to the second part of the special interest requirement, also known as the specific injury requirement. In Bell, id. at 577, 113 A.3d at 662, we explained that a plaintiff must show that the allegedly illegal or *ultra vires* "action may injuriously affect the taxpayer's property, meaning that it reasonably may result in a pecuniary loss to the taxpayer or an increase in taxes." (Cleaned up). This means that a plaintiff must show "that the action being challenged results in a pecuniary loss or an increase in taxes[,]" id. at 578, 113 A.3d at 662 (cleaned up), and that "[t]he harm alleged must be particularized and pecuniary, as opposed to harms to the general public . . . , and caused potentially by the comprehensive zoning[,]" Zimmer Dev., 444 Md. at 509 n.10, 120 A.3d at 688 n.10 (citation omitted).

In this case, Petitioners have failed to show a special interest in the subject matter of this case distinct from that of the general public by failing to sufficiently allege pecuniary

loss or an increase in taxes. Put plainly, Petitioners simply have not shown that the allegedly illegal or *ultra vires* acts by Respondent may result in a pecuniary loss or an increase in taxes. Rather, the allegations of the complaint demonstrate that Petitioners' theory of pecuniary loss or increase in taxes is vague and not easily understandable. At oral argument, Petitioners' counsel argued that Petitioners had sufficiently alleged pecuniary loss and an increase in taxes, and drew this Court's attention to paragraphs 39 through 50 of the complaint, set forth above. A review of the complaint, however, demonstrates otherwise. In the complaint, at paragraph 39, Petitioners baldly alleged that "[t]he *ultra vires* or illegal imposition of a new Zoning Map on Baltimore City will cause Baltimore City taxpayers to suffer pecuniary losses or tax increases." Petitioners did not allege, with any explanation or particularity, the pecuniary losses or tax increases expected or how the new Zoning Map potentially would result in such harm. Petitioners simply stated that pecuniary loss and tax increases would occur. This is a bare allegation that, in and of itself, is insufficient to establish taxpayer standing. Were we to conclude otherwise, anyone could establish taxpayer standing by merely using the magic words "pecuniary loss and an increase in taxes."

Similarly, in paragraphs 44 and 45, Petitioners alleged that adoption of the Zoning Map by *ultra vires* or illegal means could "overburden the taxpayer-funded resources of City agencies, boards[,] and commissions that review and issue permits and zoning authorizations[,]" and would "place extra burdens on the taxpayer-funded resources of the City Law Department[.]" The meaning of these allegations is difficult to discern. More importantly, the allegations fall far short of alleging any pecuniary loss or increase in taxes

- 30 -

potentially caused by the comprehensive rezoning, and instead appear to refer to potential costs caused by defending challenges to the comprehensive rezoning and Zoning Map. In addition, in paragraph 50 of the complaint, Petitioners alleged that "[b]onds may be issued to support the development of unlawfully rezoned property." Again, this allegation lacks any explanation or specificity. Overall, the complaint fails to allege any injury resulting in a pecuniary loss or an increase in taxes due to the comprehensive rezoning.

In the complaint, Petitioners alleged harm that has no connection whatsoever to a pecuniary loss or tax increase. For example, in paragraph 40 of the complaint, Petitioners alleged that "[a] Zoning Map adopted by *ultra vires* or illegal means lacks the presumption of validity afforded in Maryland to lawful comprehensive rezonings." And, in paragraph 41, Petitioners alleged that "an unlawfully adopted Zoning Map w[ould] bring prolonged instability to Baltimore City" because there is "no statute of limitations for claiming error in a comprehensive rezoning[.]" The alleged harms—lack of presumption of validity and instability—are not the types of injury on which taxpayer standing is predicated. These types of alleged harms have no relationship to the expenditure of public funds or taxation in Baltimore City. The comprehensive rezoning ordinances are not spending or tax bills, and there was no well-pled allegation that taxes were, or would be, raised as a result of the enactment of the ordinances, or that the enactment of the ordinances would result in pecuniary loss.

Moreover, we determine that, even had Petitioners satisfied the specific injury part of the special interest requirement, Petitioners failed to establish taxpayer standing because they failed to show a nexus between the potential pecuniary damage and the challenged

- 31 -

act.  See Bell, 442 Md. at 579, 113 A.3d at 663.  As we explained in Bell, id. at 579, 113 A.3d at 663, the nexus requirement "is perhaps the most frequent stumbling block for complainants claiming taxpayer standing" because, to demonstrate a nexus, "the taxpayer must be asserting a challenge and seeking a remedy that, if granted, would alleviate the tax burden on that individual and others; otherwise, standing does not exist."  (Cleaned up).  Stated otherwise, "[t]here must be . . . a connection between the alleged[ly] illegal or *ultra vires* act, the harm caused to the taxpayer, and the potential for the remedy to alleviate the harm incurred."  Id. at 579, 113 A.3d at 663 (citation omitted).  Here, there is no meaningful connection between the allegedly illegal or *ultra vires* acts and the harms claimed; *i.e.*, there is no connection between the comprehensive rezoning and any alleged pecuniary loss or tax increase.  Put simply, a sufficient nexus was not alleged.

In the complaint, Petitioners alleged that Respondent engaged in illegal or *ultra vires* acts by enacting the Zoning Map without the required notices, publication, and public hearings.  Significantly, however, the harms alleged are not related to those allegedly illegal or *ultra vires* acts.  As explained above, Petitioners alleged vague, unspecified harm; and any alleged potential pecuniary loss or tax increase is simply not related to lack of notice, publication, and public hearings.  Rather, the potential pecuniary loss or tax increase, as alleged in the complaint, appears to hinge on the increase in taxes that Petitioners posit will occur as a result of challenges to zoning under the new Zoning Map to, among other things, "respond to or correct errors and allegations of mistake[.]"  As best as we can glean, Petitioners' main claim of increased tax burden appears to be based on the allegation that an invalidly enacted Zoning Map will result in Baltimore City having to

- 32 -

raise taxes to pay for the legal defense to litigation that Petitioners predict will arise from an allegedly unlawful Zoning Map. Petitioners' reasoning is circular, and depends on the Zoning Map being, in fact, invalid, and on taxpayers challenging the Zoning Map. In other words, the harms alleged are unrelated to Respondent's allegedly illegal or *ultra vires* actions.

Additionally, Petitioners failed to seek a remedy that, if granted, would alleviate any alleged tax burden or pecuniary loss that would result if the Zoning Map remains in place. In the complaint, as to the remedy, Petitioners sought declarations that Respondent failed to comply with applicable notice, publication, and public hearing requirements in adopting and enacting the Zoning Map, and that the Zoning Map was null and void. However, it is difficult to comprehend how nullifying the Zoning Map would alleviate an alleged tax burden, which depends on challenges being made to the Zoning Map. In short, we fail to discern not only a nexus between the allegedly illegal or *ultra vires* acts and the harms allegedly caused to taxpayers, but also any nexus between the requested remedy and its ability to alleviate the alleged harms.

As a final matter, we note that this case's circumstances are readily distinguishable from cases in which this Court has concluded or observed that plaintiffs had established taxpayer standing to maintain their actions. Significantly, Petitioners failed to allege with any particularity or specificity the expenditure of public funds or an increase in taxes potentially resulting from the allegedly illegal or *ultra vires* acts. By contrast, in several cases in which this Court concluded or observed that taxpayer standing had been established, the plaintiffs had specifically alleged pecuniary loss or increased taxes. For

- 33 -

example, in <u>Boitnott</u>, 356 Md. at 234, 738 A.2d at 885, the plaintiffs alleged that Baltimore City had expended $20 million in development costs prior to the litigation, and we observed that such an allegation was sufficient to show "potential pecuniary damage by way of [a] tax increase[.]" In <u>State Ctr.</u>, 438 Md. at 577, 92 A.3d at 475, the plaintiffs alleged that the project at issue was expected to cost $1.5 billion, that a State agency had agreed to contribute up to $28 million in taxpayer funds toward the cost of designing and constructing an underground garage for the project, and that issuance of $33 million in bonds supported by taxpayer revenues to build the garage had been approved. In that case, we determined that the plaintiffs "pleaded sufficiently a loss of revenue from the public funds as contributed by them as taxpayers." <u>Id.</u> at 581, 92 A.3d at 478. Similarly, in <u>James</u>, 281 Md. at 139, 377 A.2d at 866, the plaintiff alleged that the county executive had expended $5 million in bond proceeds for the construction of a new courthouse. And, in <u>McKaig</u>, 208 Md. at 102, 116 A.2d at 388, the plaintiff had alleged that $70,000 per year for seven years was to be diverted from a city's highway maintenance funds to help pay for the cost of construction of an expressway, and that the city's budget provided for more than $127,000 for streets and alleys that would have to be replaced by funds derived from increased taxes.

In this case, however, Petitioners failed to make any allegation of the kind like those made by plaintiffs in <u>Boitnott</u>, <u>State Ctr.</u>, <u>James</u>, or <u>McKaig</u>. Indeed, Petitioners did not allege that Baltimore City has expended funds or that taxes have been increased as a result

of the enactment of the comprehensive rezoning ordinances and Zoning Map.[8] We reiterate

that Petitioners' allegations of harm are imprecise and, for the most part, undefined, and

do not pertain to a type of loss caused by the comprehensive zoning, but rather a type of

loss caused by the cost of defending against challenges like the one brought by Petitioners.

We observe that this case is similar to Bell, 442 Md. at 584-85, 113 A.3d at 666-67, in

which this Court determined that the plaintiffs had failed to establish taxpayer standing

because they failed to allege with any particularity "that their taxes would be increased or

that the illegal action would result in any other form of pecuniary loss." (Footnote omitted).

Accordingly, for all the reasons set forth above, we hold that Petitioners did not

satisfy the requirements of taxpayer standing, and that the circuit court properly granted

the motion to dismiss.

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. PETITIONERS TO PAY COSTS.**

---

[8]We note that we do not hold that a complainant must allege a specific monetary amount to establish taxpayer standing; rather, that happened to be the circumstance in each Boitnott, State Ctr., James, and McKaig. Nothing in our opinion should be read as creating a requirement that a complainant allege, in the form of a specific monetary amount, the harms that were caused by the allegedly illegal or *ultra vires* act. Rather, as we have stated, to satisfy the "special interest" requirement, a complainant must allege that the illegal or *ultra vires* act "may injuriously affect the taxpayer's property, meaning that it reasonably may result in a pecuniary loss to the taxpayer or an increase in taxes." Bell, 442 Md. at 577, 113 A.3d at 662 (cleaned up). And, Petitioners have failed to do so here.

Circuit Court for Baltimore City
Case No.: 24-C-17-003021
Argued: November 30, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 35

September Term, 2018

_____

JOAN FLOYD, et al.

v.

MAYOR AND CITY COUNCIL OF
BALTIMORE

_____

Barbera, C.J.
Greene
McDonald
Watts
Hotten
Getty,
Adkins, Sally D.,
    (Senior Judge, Specially Assigned)

JJ.

_____

Concurring Opinion by Adkins, J., which
Barbera, C.J., and McDonald, J., join.

_____

Filed: April 1, 2019

I fully agree with the Majority opinion that Floyd has failed to allege sufficient facts to establish taxpayer standing. Most respectfully, I write this concurring opinion in recognition that the history of what constitutes "special interest" for taxpayer standing in Maryland is, as we have recently said, "disorganized," as a whole, and "at times, seemingly contradictory . . . ." *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 540–41 (2014). Judge Harrell, authoring *State Center*, undertook a close examination of that history in an effort to clarify the doctrine and, in my estimation, succeeded in untangling the web of earlier cases. For this reason, when examining a taxpayer standing issue, I tether my analysis to *State Center*, eschewing any earlier law that is ambiguous or inconsistent therewith.

*State Center* explained that to establish eligibility to bring a taxpayer suit, the plaintiff must demonstrate that: (a) "the complainant is a taxpayer," and (b) "the suit is brought, either expressly or implicitly, on behalf of all other taxpayers." *Id.* at 547. The second broad requirement is that parties must assert a "special interest," alternatively referred to as the "special damage" requirement. Special interest requires a taxpayer to allege: (i) an action by a municipal corporation or public official that is illegal or *ultra vires*; and (ii) that the action may injuriously affect the taxpayer's property, meaning that it reasonably may cause an increased burden relating to taxation. *See id.* at 540. These are known as the (1) "illegal or *ultra vires* act" prong, and (2) the "specific injury" prong. *See id.* at 555–56.

In *State Center*, we examined three discrete topics as part of the "specific injury" prong: the type of harm alleged, the nexus between the alleged harm and the illegal or *ultra*

*vires* act, and the requisite degree of harm. *See id.* at 560. To demonstrate the type of harm necessary for specific injury, the plaintiff must show, first, that the harm is sufficiently likely to affect their taxes or result in a pecuniary loss, and, then, that the plaintiff has a "special interest distinct from the general public," *id.* at 556.

As to the first showing, only a reasonable possibility of either pecuniary loss, **or** a tax increase, must be shown. *See id.* at 559. In assessing standing, we have never asked for more than a "potential" showing of such harms, *id.*, and have "exhibited great leniency in [our] interpretation of 'potential pecuniary loss,'" *id.* at 561 (citations omitted).

As to the second showing, Judge Harrell wrote that, "[a] party may be a resident of the State (and, thus, have a 'general interest' in the State's actions), but not be a taxpayer whose pecuniary interest would be affected by that action (and, thus, not have the requisite 'special interest')." *Id.* at 559 n.65. Surely the "taxpayer" to whom we referred means any individual who may be liable to replenish the fisc. Conversely, the "general public" comprises all residents, including those not subject to such liability. Hence, "taxpayer" means those in the relevant jurisdiction subject to the taxation which is alleged to have been increased or wasted, while the "general public" amounts to those who are not subject to such taxation.

I agree with the Majority that Appellants' allegation of potential tax increase or pecuniary loss is "vague and not easily understandable." Maj. Slip Op. at 30. Appellants do not sufficiently allege "how the new Zoning Map potentially would result" in pecuniary losses or tax increases. Maj. Slip Op. at 30. Merely alleging that there will be potential costs caused by defending challenges to the comprehensive rezoning is insufficient. This

2

is tantamount to saying that a plaintiff may self-create the type of harm required just by being litigious—a classic bootstrap theory, unworthy of recognition.[1] In my mind, the Majority need not reach anything past this point.

Finally, it is also unnecessary for the Majority to distinguish the plaintiffs here from more successful plaintiffs in its closing paragraphs: "By contrast, in several cases in which this Court concluded or observed that taxpayer standing had been established, the plaintiffs had specifically alleged pecuniary loss or increased taxes." Maj. Slip Op. at 33. Although the Majority, in a footnote, acknowledges that no specific monetary amount is necessary to prevail, the discussion in its closing paragraphs leaves the impression that these specific dollar allegations are somehow important. *See State Center*, 438 Md. at 577 ($1.5 billion project); *Boitnott v. Mayor & City Council of Balt.*, 356 Md. 226, 234 (1999) ($20 million in development costs); *James v. Anderson*, 281 Md. 137, 139 (1977) ($5 million bond for construction of new courthouse); *McKaig v. Mayor & City Council of Cumberland*, 208 Md. 95, 102 (1955) ($70,000 per year for seven years for construction of expressway). In so doing, it may suggest some narrowing of the cases that will qualify for taxpayer standing.

Indeed, in evaluating the "degree of harm" necessary for specific injury, we have never asked for more than a "potential" showing of such harms, *State Center*, 438 Md. at

---

[1] To the extent our past decisions, *see Inlet Associates v. Assateague House Condominium Association*, 313 Md. 413, 442 (1988); *Citizen's Planning & Hous. Ass'n v. Cty. Executive of Balt. Cty.*, 273 Md. 333, 343 (1974), suggest that taxpayer injury can result from the expenditure of funds necessary for the city to defend the legality of the challenged act, I believe the Court has now specifically rejected such a conclusion. I agree with this result.

559, and have "exhibited great leniency in [our] interpretation of 'potential pecuniary loss,'" *id.* at 561 (citations omitted). Certainly, there are, and will be, cases in which we conclude that the alleged injury is de minimis—not worthy of recognition. But this conclusion should be reached from an assessment of all the circumstances, without undue emphasis on the presence or absence of specific dollar harms and it is not necessary here.

For the reasons set forth above, I join in the judgment only, in this case.

Chief Judge Barbera and Judge McDonald have authorized me to state that they concur with the views expressed in this opinion.